IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:22-CV-501

| | | |
|---|---|---|
| NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY, a North Carolina corporation, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | <u>COMPLAINT</u> |
| v. | ) | |
| | ) | |
| STEVEN FICKES, | ) | |
| | ) | |
| Defendant. | ) | |

## **INTRODUCTION**

Plaintiff North Carolina Mutual Life Insurance Company ("North Carolina Mutual" or the "Company") entrusted defendant Steven Fickes ("Defendant" or "Fickes"), with identifying, vetting and recommending competent business partners with whom to invest and hold a significant amount of the Company's assets. Fickes failed to exercise his respective proper business judgment in the identification, vetting, and recommendation of competent business partners with whom to invest and hold a significant amount of the Company's assets. Instead, Fickes conspired with others to harm North Carolina Mutual and its shareholders over many months. As a direct result of Fickes' intentional acts and failure to exercise the proper due diligence, North Carolina Mutual's assets were not invested in compliance with North Carolina law and the applicable agreements, which resulted in substantial loss to the Company and its policyholders. Furthermore, Fickes intentionally withheld information from the Company that the Company's assets had been

1

improperly invested, thereby causing the Company and its Shareholders additional, unnecessary damage.

## PARTIES

1.     North Carolina Mutual is a corporation organized and existing under the laws of North Carolina, with its principal office and place of business located in Durham, North Carolina, which on December 3, 2018, was placed in rehabilitation under the North Carolina Commissioner of Insurance pursuant to Order of the Honorable A. Graham Shirley, II, Wake County Superior Court in the matter of *Mike Causey, Commissioner of Insurance of North Carolina v. North Carolina Mutual Life Insurance Company*, case number 18 CVS 14480.  This action is brought pursuant to the Order of Rehabilitation, Order Appointing Receiver, Order Granting Injunctive Relief, dated December 3, 2018, authorizing this action.

2.     Upon information and belief, Fickes is an individual who is a resident of Bethesda, Maryland.   At all times relevant to this Complaint, Fickes was founder, president, and primary senior manager of Port Royal Reassurance Company, SPC, LTD ("Port Royal"), a Cayman Island corporation.

3.     Port Royal served as North Carolina Mutual's reinsurer and trust grantor in a reinsurance transaction, to be further described below.

4.     Upon information and belief, Fickes operated Port Royal in such a manner that Port Royal is a mere instrumentality and alter ego of Fickes.

## JURISDICTION AND VENUE

5.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) because it is a judicial district in which a substantial part of the events giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

**A.    North Carolina Mutual's Reinsurance.**

7.    North Carolina Mutual is an insurance company that was founded in 1898 and serves the insurance needs of both individuals and groups.

8.    North Carolina Mutual services over 200,000 individual policyholders and there are over 250,000 people covered under its group policies nationwide.

9.    In or around December 2003, North Carolina Mutual and Max Re Ltd., which subsequently changed its name to, or was purchased by, Markel Bermuda, Limited ("Markel"), entered a Co-Insurance Agreement wherein North Carolina Mutual agreed to cede to Markel liabilities and obligations with respect to certain of North Carolina Mutual's insurance policies.  North Carolina Mutual earned approximately $700,000 annually for servicing the ceded policies.

10.    In or around 2014, North Carolina Mutual's then CEO, James Speed ("Speed"), considered having North Carolina Mutual buy the insurance policies back from

3

Markel. On behalf of North Carolina Mutual, Speed sought to protect the servicing revenue should the business be sold by Markel to another buyer.

11.     Speed contacted Fickes to assist with negotiating a termination or transfer of the Markel agreements and services and with locating and securing a reinsurer and investment advisor.

12.     Fickes, an actuary, is certified by the American Academy of Actuaries, is a fellow in the Society of Actuaries, and is the founder and president of Raedel Financial Solutions, Inc. Fickes previously served as an actuary or other consultant for North Carolina Mutual.

13.     Upon information and belief, Speed ceded authority to Fickes to negotiate with Markel on North Carolina Mutual's behalf and Fickes did negotiate with Markel on behalf of North Carolina Mutual.

14.     Fickes eventually introduced Forefront Partners, LLC, and its members Bradley Reifler ("Reifler") and Michael Flatley ("Flatley"), to Speed as an entity and persons that could fund the purchase of the block of business with Markel but not hold the assets, which were to be kept by a trustee. As detailed below, Fickes encouraged and convinced Speed to execute the transaction with disastrous results.

15.     Fickes established Port Royal Reassurance Company SPC, Ltd. ("Port Royal") for the purpose of entering into the transaction as set forth below and serving as the reinsurer for North Carolina Mutual.

16.     Port Royal and North Carolina Mutual entered an indemnity reinsurance agreement, through a Novation Agreement effective April 24, 2015 (the "Novation

4

Agreement"), pursuant to which Port Royal accepted and reinsured on a one-hundred percent (100%) coinsurance basis certain risks, liabilities, and obligations of North Carolina Mutual under certain of its life-insurance policies and annuity contracts.

17.     The Novation Agreement allowed Markel to keep $5,000,000 as a ceding commission (the "Novation Commission") from the Novation Premium.

18.     Pursuant to, and as required by the Novation Agreement, on April 23, 2015, North Carolina Mutual, Port Royal, and Summit Trust Company ("Summit") executed a Reinsurance Trust Agreement (the "Trust Agreement").  A true and correct copy of the Trust Agreement is attached as Exhibit A.

19.     Pursuant to the Trust Agreement and the Novation Agreement, Markel – on behalf of Port Royal as the Grantor under the Trust Agreement – deposited approximately $34,000,000 in North Carolina Mutual reserves (the "Trust Assets") into a trust account (the "Trust Account").

20.     Port Royal is also the Reinsurer under the Trust Agreement.

21.     Section 1(b) of the Trust Agreement provides the follow:

> If, on any Measurement Date, the fair market value of the [Trust] Assets held in the Trust Account on such date shall be less than the Statutory Reserves and Liabilities . . . as set forth in the quarterly settlement report delivered by [North Carolina Mutual] to [Port Royal] on such date . . . , [Port Royal] shall promptly, but in no event later than five (5) Business Days after such date, deposit additional [Trust]Assets having a fair market value of not less than the [deficiency].

5

22.     Additionally, pursuant to the Novation Agreement, Port Royal was required to make up the shortfall between the Novation Premium and the required reserves, which was equal to the $5,000,000 Novation Commission kept by Markel.

23.     Forefront Capital Holdings, LLC ("Forefront Capital Holdings"), a company affiliated with Reifler and Forefront Partners, LLC, was to fund the $5,000,000 shortfall on behalf of Port Royal into the Trust Assets.

24.     In addition to Forefront Capital Holdings, Reifler managed and/or maintained a beneficial interest in various interrelated entities, including Stamford Brook Capital, LLC ("Stamford Brook"), Forefront Capital Holdings, Forefront Capital Services, LLC, Forefront Partners, LLC, and Forefront Partners Short Term Notes, LLC (collectively, the "Forefront Entities").

25.     Reifler, David Wasitowski ("Wasitowski") and Flatley (together, the "Forefront Individuals") or some combination thereof, owned, controlled, and/or operated the Forefront Entities named above.

26.     Pursuant to the Trust Agreement, Summit serves as the Trust Account's trustee.

27.     North Carolina Mutual is the Trust Account's beneficiary.

28.     The Trust Agreement permits Port Royal to appoint an "Investment Manager" to manage the investment of the Trust Assets.

29.     Section 4(d) of the Trust Agreement requires the Investment Manager to manage the Trust Assets "subject to the terms and conditions of the Trust Agreement."

6

30.     Section 4(b) of the Trust Agreement requires that the Trustee invest the Trust Assets only in Eligible Assets.  To be an Eligible Asset under the Trust Agreement means those securities specified in the investment guidelines attached to the Trust Agreement, which provide that an "Eligible Investment" must:

     i.      meet all the requirements of N.C. Gen. Stat. § 58-7-173, and

     ii.      be limited to income producing securities, with

     iii.      appropriate duration or maturity dates after consideration of the duration of the reinsured liabilities, and

     iv.      have an average rating of a 2 or better based upon the ratings of the NAIC's Security Valuation Office ("SVO"), or equivalent rating thereof, and

     v.      be subject to certain concentration limitations prescribed by the North Carolina Insurance Code, and

     vi.      meet the level of collateral and term limitations as provided by N.C. Gen. Stat. § 58-7-173 (15).

31.     Compliance with these investment requirements, and in particular with N.C. Gen. Stat. § 58-7-173, is critical for anyone or any entity investing North Carolina Mutual's assets.

32.     As stated in Section 4(d) of the Trust Agreement, Port Royal appointed Stamford Brook as Investment Manager of the Trust Assets, of which North Carolina Mutual is the beneficiary.  Upon information and belief, Stamford Brook is an affiliate and/or subsidiary of Forefront Capital Holdings.  Whether Stamford Brook in fact existed at the time of the transactions is unknown.  (Reifler has testified that he is Stamford Brook's

7

sole owner and that it was never a fully formed entity capable of executing any agreement or document.)

33.     Pursuant to Section 4(d) of the Trust Agreement, Port Royal and Stamford Brook entered an "Investment Advisory Agreement" effective as of April 24, 2015, for the direct benefit of North Carolina Mutual, as evidenced by, *inter alia*, the fact North Carolina Mutual was the sole  Beneficiary of the assets to be managed by Stamford Brook.

34.     The Investment Advisory Agreement incorporates the same requirements for the investment of Trust Assets in the "Eligible Investments" as in the Trust Agreement. A true and correct copy of the Investment Advisory Agreement is attached as Exhibit B.

35.     The Investment Advisory Agreement was negotiated and drafted, at least in part, by Wasitowski, Flatley, Reifler and Fickes.

36.     The Investment Advisory Agreement was signed by Steven Fickes on behalf of Port Royal.

**B**.     **Port Royal is the Alter Ego of Fickes.**

37.     Fickes operated Port Royal in such a manner that Port Royal is a mere instrumentality and alter ego of Fickes.

38.     The corporate form of Port Royal should be disregarded to permit North Carolina Mutual to reach the assets of Fickes to satisfy any judgments of Port Royal.  Facts supporting disregarding the corporate form of Port Royal, or piercing the corporate veil of Port Royal, include but are not limited to the following:

    A. Fickes controlled and completely dominated the policies and business practices of Port Royal so that Port Royal had at the time no separate mind,

will, or existence of its own as it related to the Trust Agreement and dealings with North Carolina Mutual and the Forefront Entities and Individuals;

B. Port Royal failed to comply with corporate formalities, including, *inter alia*, failing to conduct Board of Director meetings, appointing idle Directors, and/or failing to use separate email accounts for Port Royal business;

C. By failing to inject capital into Port Royal, Fickes formed Port Royal with no intention of meeting the contractual obligations of the Trust Agreement, including Section 1(b), or any other agreement; and

D. Fickes' conduct in causing North Carolina Mutual's assets to be transferred to the Trust Account pursuant to the Trust Agreement was for the benefit of the Forefront Entities and Individuals, Port Royal, and Fickes.

### C. Lack of Due Diligence

39. Fickes was responsible for vetting Stamford Brook, Forefront Partners, LLC, and related entities, including, Forefront Capital Holdings, Forefront Income Trust ("FIT"), and Reifler in relation to the reinsurance transaction. His responsibility was great given that approximately $35,000,000 was at stake and it involved a substantial portion of the assets of North Carolina Mutual.

40. Fickes admits that his due diligence efforts were limited to (i) a cursory review of Google and other internet searches of the Forefront Entities and FIT, (ii) reviewing a Bloomberg article and verifying that FIT had a ticker symbol for trade on the public stock exchange, (iii) understanding that "closed end funds" such as FIT were required to publicly file all of their investments, and (iv) analyzing a balance sheet of FIT.

9

41.     While analyzing the balance sheet, Fickes realized or should have realized that many of FIT's assets appeared to be held directly by other Forefront Entities.

42.     Fickes did not attempt to learn what experience Stamford Brook, the Forefront Entities, Flatley, or Reifler had in managing reinsurance assets. In fact, Stamford Brook, the Forefront Entities, Flatley, and Reifler had little to no experience managing reinsurance assets.

43.     Fickes was responsible for selecting Summit as the Trustee and Forefront/Stamford Brook as the Investment Adviser.

44.     Fickes failed to determine the legal existence of Stamford Brook.

45.     Fickes failed to disclose the interrelationship of Port Royal, the Forefront entities (and Reifler), and Summit, which reasonably could have raised a red flag about the transactions to North Carolina Mutual executives. Reasonable due diligence, for example, would have revealed that Reifler had been sued by his business partners for misappropriating funds, had a multi-million dollar judgment against him by JPMorgan Chase Bank, N.A., and that he faced a significant tax judgment.

**D. Fickes, the Forefront Entities, Reifler, and Flatley Scheme to Gain Control Over North Carolina Mutual's Trust Assets and Immediately Transfer Them Into Investments Designed to Benefit the Forefront Entities and Themselves Individually, Which Investments Fail to Satisfy the Requirements of the Trust Agreement, the Investment Advisory Agreement, and North Carolina General Statute § 58-7-173.**

46.     Beginning in or about November 2014, the Forefront Entities and Individuals and Fickes developed a scheme to obtain control over the Trust Assets, including by directing Trust Assets to entities in which the Forefront Entities and Individuals hold, or

10

held, a beneficial interest, or to third parties from whom the Forefront Entities and Individuals could profit through the unauthorized use of Trust Assets.

47.     On December 1, 2014, Reifler emailed Fickes, copying Flatley, to discuss how profits from their scheme would be split 60% to Forefront (Reifler's shorthand way of referring to all of his related "Forefront" entities, which, upon information and belief, he treats as a single enterprise), and 40% to Fickes/Port Royal. Fickes hid his business relationship with Reifler from North Carolina Mutual].

48.     On or about December 17, 2014, Wasitowski, Flatley, and Fickes traveled to Durham, North Carolina in order to meet with senior executives of North Carolina Mutual to, *inter alia*, persuade North Carolina Mutual to change its reinsurer from Markel to Port Royal in order to gain access to, and control over, the Trust Assets.

49.     On or about January 22, 2015, Flatley and Reifler discussed the method by which they would, through one or more Forefront Entities, borrow $6,000,000 in order to pay Markel the Novation Commission to obtain the Trust Assets as well as attendant closing costs.

50.     Upon information and belief, the $6,000,000 used to pay the Novation Commission and closing costs was borrowed by the Forefront Entities or its affiliates from Summit, which used funds from its other trust clients to fund the loan, none of which was disclosed to North Carolina Mutual.

51.     On or about January 27, 2015, Wasitowski, with the knowledge and agreement of the other Forefront Entities and Individuals, directed the creation of Stamford Brook, which was intended to serve as the Investment Manager for the Trust Assets.

11

52. On or about February 26, 2015, Reifler, Flatley, and Wasitowski, in concert with others, set up one or more bank accounts for an entity called "Port Royal - NCM, LLC" for the purpose of diverting Trust Assets for the benefit of the Forefront Entities and Individuals and their associates and affiliated entities.

53. Upon information and belief, naming the account using the name "Port Royal" and referencing "NCM" (apparently an acronym for Plaintiff North Carolina Mutual), was intended to allow the Forefront Entities and Individuals to falsely represent that transactions entered into with that entity— or funds transferred to one or more bank accounts bearing that name—were related to Assets held pursuant to the Trust Agreement or in the Summit Trust.

54. On March 24, 2015, Fickes emailed a copy of the Trust Agreement to Flatley, explaining that "[a]ny monies in the Trust Agreement are somewhat restricted." Fickes then forwarded that email and the Trust Agreement to Wasitowski that same day.

55. On March 27, 2015, Fickes and Flatley discussed their plan for Fickes to travel to New York City so that Fickes and Wasitowski could "map out where all of the money [would] be invested."

56. Beginning on or about April 1, 2015 and continuing through at least April 24, 2015, Reifler, Wasitowski, and Flatley negotiated terms of the Investment Advisory Agreement with Fickes.

57. On April 16, 2015, Fickes exchanged emails with Wasitowski, copying Flatley, to confirm an agreement that Forefront Partners, LLC, a company beneficially owned and managed by Reifler, was to have an ownership interest in Port Royal.

12

58.     This agreement, which created a clear conflict of interest, was concealed from North Carolina Mutual

59.     After the execution of the Trust Agreement between North Carolina Mutual, Port Royal, and Summit, and the Investment Advisory Agreement between Port Royal and Stamford Brook, on or about April 27, 2015, Fickes foreshadowed what would in fact occur over the ensuing months by emailing Reifler and stating that "[w]hen the wire [of Trust Assets] is in, **please pillage in moderation**." (emphasis added).

60.     Indeed, in June 2015, representatives of Forefront Capital Holdings provided an altered and/or forged copy of the Investment Advisory Agreement to Summit (the "Fraudulent Investment Advisory Agreement").

61.     The Fraudulent Investment Advisory Agreement showed Bradley Reifler of Millbrook, New York, as the representative signing for Stamford Brook, and Michael Flatley of Lynbrook, New York, as the representative signing for Port Royal.

62.     Flatley has never held any position with Port Royal, in any capacity.

63.     In addition, Forefront Capital Holdings submitted to Summit and/or the Trust Account's administrator, at the time Gemini Fund Services, LLC, a "List of Authorized Signers" for the Port Royal North Carolina Mutual Reassurance Trust Custodial Accounts, which included Reifler and Flatley as authorized signers.

64.     Reifler and Flatley were never authorized as signatories of the Trust Account.

Case 1:22-cv-00501-LCB-JEP   Document 1   Filed 06/30/22   Page 13 of 40

**E. Virtually all of North Carolina Mutual's Trust Assets were invested in Non-Eligible Assets in Violation of the Trust Agreement and Trust Advisory Agreement**

65.     Sometime after April 24, 2015, representatives of the Forefront Entities, invested virtually all North Carolina Mutual's cash in assets that were either directly or indirectly linked to Forefront Entities.

66.     On or about April 30, 2015, the Forefront Entities and Individuals directed $10,000,000 of Trust Assets to be transferred from Summit to make an unsecured loan to Forefront Partners, LLC.

67.     On or about April 30, 2015, the Forefront Entities and Individuals directed $6,000,000 to be transferred to make two unsecured loans to Spring Bridge 182, LLC.

68.     On or about May 4, 2015, the Forefront Entities and Individuals directed $10,000,000 of Trust Assets to be transferred from Summit to purchase shares in the FIT.

69.     At the time of the transfer to FIT, Reifler was also the sole owner of Forefront Capital Advisors, LLC, the investment advisor for FIT, served as the chairman of FIT's board of trustees, and was Founder, President, Chief Executive Officer, and Portfolio manager for FIT.  Also, at the time of the transfer to FIT, Wasitowski was the Chief Financial Officer, Chief Accounting Officer, Chief Compliance Officer, Treasurer, and Portfolio Manager of FIT.

70.     On or about June 11, 2015, the Forefront Entities and Individuals directed $500,000 of Trust Assets to be transferred from Summit for an unsecured loan to FF Sully Partners, LP.  Upon information and belief, Wasitowski was the primary manager of Sully Partners and Wasitowski and Reifler each have an ownership interest therein.

14

71.     On or about June 11, 2015, the Forefront Entities and Individuals directed $500,000 of Trust Assets to be transferred from Summit for an unsecured loan to Auto Funding Group.

72.     On or about July 31, 2015, the Forefront Entities and Individuals directed $2,000,000 of Trust Assets to be transferred from Summit for an unsecured loan to Forefront Talking Capital Investments, LLC.

73.     On or about August 14, 2015, the Forefront Entities and Individuals directed $1,000,000 of Trust Assets to be transferred from Summit for an unsecured loan to Waterbridge Capital, LLC.

74.     On or about August 31, 2015, the Forefront Entities and Individuals directed $2,000,000 of Trust Assets to be transferred from Summit for an additional unsecured loan to Forefront Partners, LLC.

75.     The investment of all the assets discussed herein failed to comply with both North Carolina law and the terms of the Trust Agreement.

76.     Upon information and belief, Fickes was aware of some, if not all, of these transactions at the time each transaction occurred or soon thereafter.

77.     Fickes knew that the transactions were in violation of the Trust Agreement and North Carolina General Statutes governing Eligible Assets.

78.     With the transfers of the Trust Assets, Fickes knew that the fair market value of the Trust Assets was less than the Statutory Reserves and Liabilities and failed to deposit additional Eligible Assets to make up the shortfall pursuant to Section 1(b) of the Trust Agreement.

15

**F. Fickes Attempted to Cover Up the Improper Investments and Concealed the Nature of the Investments From North Carolina Mutual.**

79.     Fickes, with the apparent assistance from the Forefront Entities and Individuals and the acquiescence of Summit, worked in concert to conceal from North Carolina Mutual the nature of the asset investments made with the Trust Assets.

80.     On or about May 20, 2015, Fickes emailed the Forefront Entities and Individuals to communicate concerns that the investments of Trust Assets made up to that point were improper and not Eligible Investments under the Trust Agreement or North Carolina law.

81.     On or about June 26, 2015, Fickes emailed Flatley and Reifler's assistant, who then forwarded the email to Reifler, to again communicate concerns that the investments of Trust Assets made up to that point were improper and not Eligible Investments under the Trust Agreement or North Carolina statutes. Fickes further stated that "[i]f an investment does not exactly fit the statute we need to find a way to get it to fit." By separate email of the same date, Fickes suggested to Reifler and Flatley that the FIT Transfer "works, only if it is viewed as a pass-through."

82.     On August 31, 2015, in anticipation of Summit issuing its first statement of investments from the Trust Account, Fickes emailed Reifler's assistant, who then forwarded the email to Flatley, stating, inter alia, that "[w]e can not [sic] show any investments in equities" (which is what the FIT Transfer was) and "we cannot show investments in Forefront Partners or Forefront Income Trust."

16

83.     The next day, on September 1, 2015, Fickes emailed Flatley, stating that, with regard to the transfers that had been made, "[i]n addition to violating the investment guidelines, as the investments are now being held, those investments violate the investment advisory agreement." On September 2, 2015, Flatley forwarded Fickes' email to Reifler and Reifler's assistant, stating "[l]et's please get together and discuss asap."

84.     On September 3, 2015, Fickes emailed Flatley and Wasitowski, raising additional concerns about the FIT Transfer, including that "[w]e also have FACTA [Fair and Accurate Credit Transactions Act] problems" that "this investment is trouble" and setting a phone call to discuss the issues amongst the three of them.

85.     That same day, Fickes, Flatley, and upon information and belief Wasitowski and Reifler, held a phone call and hatched a plan to present the investments of Trust Assets in a manner that was materially misleading or outright false, so that North Carolina Mutual would not know that its Trust Assets had been invested improperly. This phone call was memorialized in a September 4, 2015 email from Fickes to Flatley and Reifler's assistant, who then forwarded the email to Reifler, in which Fickes referred to the FIT Transfer and each transfer to Forefront Partners as a "Toxic Asset."

86.     At no relevant time did Fickes inform North Carolina Mutual that there were any problems with investments of the Trust Assets, let alone that the investments violated the terms of the Trust Agreement, the Investment Advisory Agreement, and North Carolina statutes. Rather, as further detailed below, Fickes, along with the Forefront Entities and Individuals, engaged in a concerted effort to mislead North Carolina Mutual about the nature of the investments and conceal their true nature.

17

87.     On September 23, 2015, Fickes, Flatley, and Reifler held further phone discussions regarding the improper transfers of Trust Assets, memorialized in two separate September 24, 2015 emails: one from Fickes to Flatley and another from Fickes to Flatley and Reifler's assistant, asking to "start the process of swapping out the Forefront Partners investment . . ." stating that "[i]t is only a matter of time before we are asked about Port Royal's investments," and confirming that the FIT Transfer "violate[d] the Investment Guideline section of the . . . Trust Agreement."

88.     On September 25, 2015, after first presenting it to Reifler for his review, Flatley emailed Fickes, attaching a "'strategic plan' for the redo on the $20 MM in FIT and FFP [Forefront Partners]." The strategic plan was entirely fictitious because the "Investments swapped from FP and F.I.T." were not legitimate investments and were never "swapped."

89.     On October 7, 2015, Fickes emailed Reifler regarding the manner in which the investments of Trust Assets were being presented to North Carolina Mutual. Fickes confirmed to Reifler that he should break the investment amounts into additional separate loans and stated, "there is no need to highlight anything [for North Carolina Mutual]."

90.     Fickes' email confirms that he and the Forefront Individuals were purposely trying to hide the true nature of the investment of Trust Assets.

91.     On October 13, 2015, Fickes emailed Reifler and Flatley, stating that "[t]ime is up" and lamenting that he would have to file statements "with the regulators . . . [that] show $10 million of cash going to each of Forefront Income Trust and Forefront Partners." The "regulators" Fickes was referring to was the Cayman Island Monetary Authority.

92.    Later that day, Reifler emailed Fickes, Flatley, and Reifler's assistant with a list showing how they could present the improper investments on statements to North Carolina Mutual and certain regulators in order to avoid raising suspicions about the propriety of the investments (the "Sham Investment List").

93.    The next day, on October 14, 2015, Fickes responded directly to Reifler, pointing out that there was several million dollars of Trust Assets missing from the investments as re- categorized by Reifler on the Sham Investment List.

94.    Later that day, Reifler's assistant emailed Fickes, Reifler, and Flatley with an updated Sham Investment List, which listed several more fictitious investments.

95.    On October 15, 2015, Reifler emailed Fickes and Flatley with yet another version of the Sham Investment List, which purported to account for all of the Trust Assets that were invested.

96.    While this version of the Sham Investment List purported to show that the Trust Assets were invested in approximately thirty different investments, in reality, no material change to the actual initial improper transfers was actually made.

97.    Fabricated documents were provided to Summit by Reifler's assistant so that the investments listed on the Sham Investment List would be reflected in Summit's statements for the Trust Account. This was done in order to mislead North Carolina Mutual regarding the actual nature of the investments that were made with the Trust Assets.

98.    The false list of investments was in fact reflected in the statements Summit provided to North Carolina Mutual, North Carolina Mutual's independent auditors, Dixon

Hughes Goodman LLP ("DHG"), and the North Carolina Department of Insurance ("NCDOI"), the state agency regulating North Carolina Mutual.

99.     Fickes was aware as early as May 20, 2015 that the investment of the Trust Assets was improper and in violation of the governing statutes and agreements. Nevertheless, between June 11, 2015 and August 31, 2015, Forefront Entities and Individuals directed $6,000,000 of Trust Assets to improper investments.

100.    Fickes failed to inform North Carolina Mutual that the Trust Assets were improperly invested in violation of the governing statutes and agreements until January 2016, at the earliest.

101.    Fickes attempted to reverse the improper investments or move the invested Trust Assets into Eligible Assets from approximately June 2015 until at least June 2016 in an effort to correct the improper investments.

102.    At all times from May 2015 to June 2016, Fickes could have informed North Carolina Mutual of the improper investments made with the Trust Assets but failed to do so.

103.    Thus, North Carolina Mutual could have avoided more than $6,000,000 in damages had Fickes informed North Carolina Mutual of the improper investments.

**G. North Carolina Mutual Undergoes Audits and the Improper Investments are Discovered by North Carolina Mutual**

104.    In or about March 2016, North Carolina Mutual began an internal audit of the Trust Assets to ensure proper documentation.

105.    At about the same time, or shortly thereafter, the NCDOI began their own audit of the Trust Assets.

106. On May 2, 2016, Charlie E. Hobgood, Jr., the employee at North Carolina Mutual who primarily led its internal audit, emailed Fickes seeking documentation for fourteen of the fabricated investments listed in the Summit Account Statements. Fickes then forwarded that email to Reifler's assistant, who in turn forwarded it to Reifler and Flatley.

107. On May 9, 2016, North Carolina Mutual's then CEO, Michael Lawrence, emailed Fickes and Flatley, asking for additional documentation and information regarding the terms of the supposed investments that were listed on the Summit Account Statements.

108. Fickes responded to Mr. Lawrence, copying Flatley, with misinformation intended to prevent raising any concerns with North Carolina Mutual and to avoid alerting them that the Summit Account Statements were materially misleading and listed dozens of purported investments of Trust Assets that were never actually made.

109. Having received little or no documentation regarding the purported investments, on May 19, 2016, Mr. Lawrence again emailed Fickes and Flatley requesting documentation to support the investments listed on the Summit Account Statements.

110. At or about this same time, the Forefront Entities and Individuals, with assistance from others, including Reifler's assistant, fabricated additional loan documents in an attempt to support the fictitious investments listed on the Summit Account Statements.

111. Also, on May 21, 2016, Fickes emailed Reifler raising errors on yet other fabricated loan documents. Fickes pointed out that, for one purported mortgage, the property address did not match the address on the deed that was provided in support of the

21

loan. He also pointed out that documentation supporting two other supposed loans was missing.

112. The reason for the glaring errors in these loan documents, through which millions-of-dollars of Trust Assets were supposedly lent, is that they were being hastily created at that time, back-dated, and forged by the Forefront Entities and Individuals.

113. On May 22, 2016, Fickes emailed Mr. Lawrence, copying Reifler, stating, in pertinent part, that "[a]t one time or another, I am sure that I have seen each mortgage loan agreement, and I have never seen anything other than a 1st mortgage loan."

114. In reality, the vast majority of so-called "mortgage loans" listed in the Sham Investment List and the Summit Account Statements were fabricated, as was the documentation purporting to support the misrepresentation that they were collateralized by real property supposedly owned by a Forefront-related entity.

115. On July 8, 2016, Fickes emailed Flatley with a proposal to try and recover the improper investment of Trust Assets in a document titled "Structure for Project Unwind," a key feature of which was the proposed creation of an entity called "UNFUCK LLC," in which liquid assets of at least $15,000,000 were proposed to be deposited.

116. However, no action was ever taken towards implementing "Project Unwind" or creating "UNFUCK LLC."

117. On June 9, 2016, Fickes emailed Reifler's assistant, copying Reifler and Flatley, noting that the interest rates on some of the fabricated loan documents did not match what had been reported to North Carolina Mutual, and noting that "it raises serious questions about the assets when things retrospectively change!"

22

118. Upon information and belief, the error in the interest rates in the loan documents (which, in any event, were fictitious), was caused by the Forefront Entities' and Individuals' rush to fabricate the false loan documents.

119. On July 12, 2016, Fickes emailed Mr. Hobgood at North Carolina Mutual, finally admitting that the investments that were made with the Trust Assets did not comply with the investment requirements under North Carolina law, but still concealing the fact that the purported investments listed on the Sham Investment List and Summit Account Statements were indeed a sham.

120. On August 16, 2016 Mr. Hobgood at North Carolina Mutual emailed Fickes, Reifler, and others at North Carolina Mutual with a list of inconsistencies and inaccuracies in the documentation the Forefront Individuals provided to support the fabricated investments on the Sham Investment List and the Summit Account Statements in anticipation of a conference call the next day. For instance, many documents purporting to pledge real estate as collateral for loans did not even list the correct title owner of the real estate that was supposedly pledged. Mr. Hobgood also pointed out that many of the promissory notes that the Forefront Individuals provided were dated July 31, 2015, but the Summit Account Statements showed those notes as existing prior to the date they supposedly were executed.

121. That same day, Fickes forwarded Mr. Hobgood's email to Flatley and Reifler's assistant, stating "I am not looking forward to tomorrow call [sic]. Other than Carillon, which was paid off, [Mr. Hobgood] is correct. See list below!"

**H. As a Direct Result of Fickes and the Forefront Entities' Intentional and Malicious Misconduct, North Carolina Mutual Has Been Significantly Damaged**

122.    On June 27, 2017, North Carolina Mutual's independent auditors, DHG, issued its *Statutory-Basis Financial Statements and Supplementary Information* for the years ending December 31, 2016 and 2015 (the "2016 Audit").

123.    As set forth in the 2016 Audit, approximately 20%, of North Carolina Mutual's reserve liabilities relate to the Trust Assets. The amount of insurance in force with Defendant Port Royal at December 31, 2016 was $51,264,447, which relates to the legacy industrial life business of North Carolina Mutual. The Company recorded a $27,392,522 liability due to the funds in the trust being inadequate to cover the reserves on this block of business at December 31, 2016.

124.    This unauthorized reinsurance liability caused North Carolina Mutual to be deemed insolvent because it was out of compliance with minimum capital and surplus standards in its state of domicile (North Carolina) and other states where it holds insurance licenses.

125.    On December 3, 2018, North Carolina Mutual was placed in Rehabilitation and Receivership pursuant to an order of the Superior Court of Wake County.

126.    Because of the foregoing actions, North Carolina Mutual suffered a loss more than $20,000,000 of its Trust Assets.

127.    North Carolina Mutual has incurred significant legal fees and other costs attempting to track down and regain the Trust Assets that were improperly invested.

24

128.    On December 1, 2020, Reifler was indicted in the United States District Court for the Middle District of North Carolina on four counts of wire fraud under 18 U.S.C. § 1343 and one count of perjury related to his actions in defrauding North Carolina Mutual out of the Trust Assets as outlined above.

129.    On May 5, 2022, Reifler pleaded guilty to one count of wire fraud under 18 U.S.C. § 1343, including causing false and fraudulent pledge agreements to be sent in interstate commerce, for the purpose of executing the scheme and artifice to defraud, to North Carolina Mutual.

## COUNT I
### Fraud

130.    North Carolina Mutual incorporates by reference the foregoing allegations of this Complaint as if fully set forth herein.

131.    As detailed above, Fickes made numerous false representations and concealed material facts that as a party to the Trust Agreement and Investment Advisory Agreement, respectively, he had a duty to disclose.

132.    As a party to the Trust Agreement and the Investment Advisory Agreement, Fickes, on behalf of Port Royal, also agreed that the Trust Assets would be invested in negotiable and Eligible Assets

133.    Fickes knew that the Trust Assets were required to be invested in negotiable and Eligible Assets, as reflected, in part, in certain correspondence referenced above.

134.    Fickes failed to advise North Carolina Mutual that he and the Forefront Entities and Individuals, in fact, never intended to, and in fact did not, invest the Trust Assets in negotiable and Eligible Assets.

25

135.    Fickes failed to advise North Carolina Mutual that the Forefront Entities and Individuals always intended on investing the Trust Assets in investments that would benefit the Forefront Entities and Individuals and their affiliates and himself.

136.    Fickes made specific misrepresentations of fact to North Carolina Mutual regarding the investment of Trust Assets, as detailed above, including but not limited to: (1) the creation of the Sham Investment List and the Summit Account Statements by, and at the direction of, Fickes, Reifler, and Flatley; (2) the fabrication of loan documentation and other financial records by, and at the direction of, Reifler, Flatley and Wasitowski; and (3) the purported validity of certain "investments," including promissory notes and other loan documents that the Forefront Entities and Individuals knew to be fabricated and forged. These misrepresentations and omissions were reasonably calculated, and intended, to deceive North Carolina Mutual.

137.    Fickes was aware that the Sham Investment List, Summit Account Statements, and forged loan documents were false, made comments or suggestions about improving the documents to better deceive North Carolina Mutual and other recipients, and failed to inform North Carolina Mutual of their falsity.

138.    North Carolina Mutual relied on these misrepresentations and concealments to its detriment as detailed above.

139.    North Carolina Mutual's reliance was reasonable under the circumstances.

140.    As a direct and proximate result of such reliance, North Carolina Mutual has been damaged in an amount in excess of $20,000,000 to be proved at trial.

26

141.    Fickes' conduct was willful and wanton and North Carolina Mutual is therefore entitled to punitive damages pursuant to N.C. Gen. Stat. Ann. § 1D-15.

## COUNT II
### Negligent Misrepresentation

142.    Plaintiff incorporates by reference the foregoing allegations of the Complaint, as if fully set forth herein.

143.    Fickes, in his individual capacity and in his capacity as a representative of Port Royal, supplied false information to North Carolina Mutual regarding the nature of the investment of the Trust Assets.

144.    Fickes failed to exercise reasonable care in obtaining and communicating the information.

145.    North Carolina Mutual reasonably and justifiably relied on this information as set forth hereinabove.

146.    As a direct and proximate result of such reliance, North Carolina Mutual has been damaged in an amount in excess of $20,000,000 to be proved at trial.

## COUNT III
### RICO Act Violations

147.    Plaintiff incorporates by reference the foregoing allegations of the Complaint, as if fully set forth herein.

148.    At all relevant times, North Carolina Mutual was a "person" within the meaning of 18 U.S.C.§ 1961(3) and § 1964(c), because North Carolina Mutual was "capable of holding a legal or beneficial interest in property" and was " injured in their business or property by a violation of 18 U.S.C. § 1962."

27

149. Fickes is a "person" within the meaning of 18 U.S.C. § 1961(3), because he is "capable of holding a legal or beneficial interest in property."

150. The enterprise, as that term is defined in 18 U.S.C. § 1961(4), consists of Fickes, the Forefront Entities and Individuals, Port Royal, and others. The enterprise engaged in and affected interstate commerce.

151. From at least 2014 through 2016, the enterprise joined together for a common purpose of misappropriating the Trust Assets, of which North Carolina Mutual is the sole beneficiary.

152. Said common purpose is shown by the actions alleged above.

153. In violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.§ § 1962(a) and (b), Fickes received fees from the Trust Assets derived from a pattern of racketeering activity and used or invested such income in the establishment, operation, and maintenance of an enterprise engaged in, or the activities of which affect, interstate commerce.

154. In violation of RICO, 18 U.S.C.§ 1962(c), Fickes has been employed by or associated with an enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate in the conduct of such enterprises' affairs through a pattern of racketeering activity.

155. The racketeering activity, as that term is defined in 18 U.S.C. § 1961(1), referred to above includes, but is not limited to the following predicate offenses:

    A. <u>Engaging in wire fraud proscribed by 18 U.S.C. § 1343,</u> by way of illustration and without limitation by: causing the improper transfer of

28

Trust Asset funds to unauthorized recipients intended to benefit himself, Port Royal, the Forefront Entities and Individuals, and others;

B. <u>Engaging in monetary transactions in property derived from specified unlawful</u>

<u>activity, in violation of 18 U.S.C. § 1957,</u> by way of illustration and without limitation, by converting to the Forefront Entities' and Individuals', Sully Partners', and other's own use without authority, conveying a thing of value being made under contract, and/or receiving same with the intent to convert it to their own gain in violation of 18 U.S.C. § 641, thereby engaging in "specified unlawful activity" within the meaning of 18 U.S.C. § 1956(7)(D).

156. Fickes and the Enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), as identified in the preceding paragraph. The Enterprise's racketeering activities have continuity inasmuch as they occurred over a prolonged period of time (2014 through 2016), and continued as a regular part of the Fickes' business practice as it relates to Port Royal.

157. The Enterprise's acts of racketeering activity are related, as they share a common purpose, participants, victim, and result, and method of commission, and are not isolated events.

158. As a direct and proximate cause of the Fickes' actions, North Carolina Mutual has been injured, and continues to be injured, in its business or property by reason of the violations of 18 U.S.C. § 1962.

29

159. By reason of these RICO violations, North Carolina Mutual is entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

**COUNT IV**
**North Carolina RICO Act Violations**

160. Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

161. By the activities set forth herein, Fickes engaged and participated in conduct in violation of certain federal and state laws, including but not limited to:

A. Engaging in wire transfers proscribed by 18 U.S.C. § 1343, by way of illustration and without limitation by: causing the improper transfer of Trust Asset funds to unauthorized recipients intended to benefit Fickes, Port Royal, the Forefront Entities and Individuals, Sully Partners, and others;

B. Engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, by way of illustration and without limitation by: (i) converting to the Forefront Entities' and Individuals', Sully Partners', and other's own use without authority, conveying a thing of value being made under contract, and/or receiving same with the intent to convert it to their own gain in violation of 18 U.S.C. § 641, thereby engaging in "specified unlawful activity" within the meaning of 18 U.S.C. § 1956(7)(D);

30

C. Obtaining property by false pretenses in violation of N.C. Gen. Stat. § 14-100, by way of illustration and without limitation, by causing Plaintiff to transfer or otherwise invest funds by making materially false and misleading statements and by presenting to Plaintiff false and misleading documents, which Fickes at the time knew or should have known were false and misleading; and

D. Embezzlement of property received by virtue of office or employment in violation of N.C. Gen. Stat. § 14-90, by way of illustration and without limitation, in that some or all of them embezzled, fraudulently, knowingly or willfully misapplied or converted to their own use, or took, made away with or secreted, with intent to embezzle or fraudulently, knowingly, or willingly misapply or convert to their own use money, goods for chattels and/or other securities belonging to Plaintiff. Thus, the Enterprise converted a substantial portion of Plaintiff's assets, notwithstanding Fickes' knowledge that the Trust Assets could be invested only in Eligible Assets.

162.    Fickes participated in, aided and abetted, and/or conspired to commit, activities in violation of N.C. Gen. Stat. § 75D.

163.    At all times relevant hereto, without North Carolina Mutual's knowledge or consent, Fickes, the Forefront Entities and Individuals, Summit, Port Royal, and others associated together to form an ongoing informal organization for the purposes of carrying out the wrongful activities set forth herein, and thus have constituted an association-in-fact "enterprise" within the meaning of that term as used in N.C. Gen. Stat. § 75D-3(a).

31

164. As used herein, the term "Enterprise" shall refer to the association-in-fact enterprise consisting of Fickes, the Forefront Entities and Individuals, Summit, Port Royal, and others.

165. The Enterprise had and has continuity of personnel, with the persons employed by or associated with the Enterprise performing particular functions and possessing certain authority within the organization.

166. In accordance with the organizational structure of the Enterprise, the persons associated therewith at times performed designated lawful functions. At other relevant times, however, certain persons associated with the Enterprise, including the Fickes, used and abused the Enterprise in furtherance of the fraudulent, illegal, and wrongful activities alleged herein.

167. The nature, organization, structure and activities of the Enterprise were such that it had an existence distinct from any one member of the Enterprise or from any individual person or entity employed by or associated with the Enterprise, and distinct from the pattern of racketeering activity engaged in by Fickes.

168. The Enterprise functioned continuously during the relevant time and, upon information and belief, continues to function.

169. At all times relevant to this action and currently, the Enterprise constitutes an "enterprise," as defined in N.C. Gen. Stat. § 75D-3(a).

170. At all times relevant to this action, Fickes was, and each still is, a "person" within the meaning of the North Carolina Racketeer Influenced and Corrupt Organizations ("RICO") Act, N.C. Gen. Stat. § 75D-1, *et seq.*

32

171. During the relevant times, in connection with the activities giving rise to this action, Fickes conspired with Reifler, Wasitowski, Flatley, the Forefront Entities and Individuals, and with others, to engage in, and did engage in, various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. §§ 1343, 1957 and N.C. Gen. Stat. §§ 14-90, 14100.

172. The acts of wire fraud, embezzlement, and obtaining property by false pretenses constituted acts of "racketeering activity" within the meaning of that term as used in N.C. Gen. Stat. § 75D-3(c).

173. The racketeering activity described hereinabove occurred repeatedly, continuously, and without interruption from the first transfer of the Trust Assets on or about April 30, 2015 until at least August 16, 2016.

174. The acts of racketeering activity alleged above have sufficient continuity and relationship to constitute a "pattern of racketeering activity" within the meaning of N.C. Gen. Stat. § 75D-3(b).

175. Fickes was employed by or associated with the Enterprise.

176. The acts of wire fraud, embezzlement, and obtaining property by false pretenses perpetrated by the Enterprise upon the Plaintiff constituted a pattern of racketeering activity consisting of more than two acts of racketeering activity.

177. The Enterprise has through the pattern of racketeering activity referred to herein acquired or maintained an interest or control of the Enterprise, in violation of N.C. Gen. Stat. § 75D-4(a)(1).

178.     Fickes participated in the conduct of the Enterprise through the above-described pattern of racketeering activity in violation of N.C. Gen. Stat. § 75D -4(a)(2).

179.     The Enterprise agreed and conspired among the members to violate N.C. Gen. Stat. § 75D-4(a)(1) and (2) in violation of N.C. Gen. Stat. § 75D-4(a)(3).

180.     The violations of N.C. Gen. Stat. § 75D-4(a)(1), (2), and (3) have proximately caused North Carolina Mutual injury and harm in its business and property in an amount to be determined at trial in this matter.

181.     In accordance with N.C. Gen. Stat. § 75D-8(c), North Carolina Mutual, concurrently with the filing of this Amended Complaint, will notify the Attorney General of North Carolina in writing of the commencement of this action.

## COUNT V
## Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1

182.     Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

183.     At all relevant times, Fickes, individually and through Port Royal, was engaged in commerce as defined by Chapter 75 of the North Carolina General Statutes.

184.     The wrongful conduct of Fickes, as alleged above, constitutes unfair or deceptive acts or practices, which has injured and will continue to injure North Carolina Mutual and which has resulted and will continue to result in damages to North Carolina Mutual.

185.     As a direct and proximate result of this unfair and deceptive conduct, North Carolina Mutual has been damaged and is entitled to a judgment against the Fickes

34

for actual damages, and those damages are to be automatically trebled pursuant to N.C. Gen. Stat. § 75-16. North Carolina Mutual is also entitled to an award attorney fees pursuant to N.C. Gen. Stat. § 75-16.1.

## COUNT VI
### Civil Conspiracy

186.    Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

187.    As set forth above, Fickes, Port Royal, the Forefront Entities and Individuals, and others engaged in a common scheme and understanding with others, either express or implied, in which they abused their position of trust reinsurers and as investment advisors to North Carolina Mutual by investing the Trust Assets for their own personal gain and to the detriment of North Carolina Mutual. Among other things, they provided an unauthorized List of Authorized Signers for the Trust Account to Summit to gain access to the Trust Assets; fabricated a myriad of loan documents, concealed from North Carolina Mutual, with agreement and assistance from Fickes and Port Royal, information regarding the actual investments made with Trust Assets, Fickes, through Port Royal, expressly agreed to invest the Trust Assets in Eligible Assets and failed to inform North Carolina Mutual that the Trust Assets had been improperly invested.

188.    Fickes had an independent personal financial stake in the object of the conspiracy, in that—as alleged herein—they invested the Trust Assets into investments through which the Fickes, through Port Royal, stood to benefit.

Case 1:22-cv-00501-LCB-JEP   Document 1   Filed 06/30/22   Page 35 of 40

189.    As a direct and proximate result of this civil conspiracy, North Carolina Mutual has been damaged in an amount in excess of $20,000,000 to be proven at trial and is entitled to compensatory and punitive damages.

## COUNT VII
## Breach of Contract (Trust Agreement)

190.    Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

191.    The Trust Agreement constitutes a valid, bargained for contract between Port Royal, Summit, and North Carolina Mutual.

192.    North Carolina Mutual fulfilled all of its material obligations under the Trust Agreement.

193.    Section 1(b) of the Trust Agreement requires Port Royal to "deposit additional Assets" in the event the "fair market value of the Assets held in the Trust Account on such date [are] less than the Statutory Reserves and Liabilities . . . as set forth in the quarterly settlement report."

194.    Port Royal breached the Trust Agreement by failing to deposit additional Assets into the Trust Account after the transfer of Trust Assets to non-Eligible Assets.

195.    Pursuant to Section 1(c) of the Trust Agreement, Port Royal represented, warranted, and covenanted that the Trust Assets would be negotiable and would consist only of Eligible Assets.

196.    Port Royal breached the Trust Agreement by permitting Trust Assets that are neither negotiable nor Eligible Assets.

36

197.    Section 4(f) of the Trust Agreement requires that "[a]ll investments and substitutions of securities [for the Trust Assets] . . .  shall be in compliance with the applicable provisions of the North Carolina Insurance Code, as set forth in the definition of 'Eligible Assets' in Section 11 of the [Trust] Agreement."

198.    Port Royal breached the Trust Agreement by permitting the investment of the Trust Assets in instruments and securities that were in violation of Section 4(f) and Section 11 of the Trust Agreement.

199.    As a direct, proximate, and foreseeable result of Port Royal's breaches of the Trust Agreement, North Carolina Mutual has been damaged in an amount to be proven at trial.

## COUNT VIII
## Unjust Enrichment

200.    Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

201.    Port Royal also took payments from the Trust Assets in the form of administrative fees and other remuneration that had not been earned and to which they were not entitled.

202.    Fickes, as the sole owner, founder, president, and primary senior manager of Port Royal thereby benefited from those payments.

203.    At the time that Fickes/Port Royal received those funds, Fickes understood that North Carolina Mutual expected to receive certain services in exchange for any administrative fees and other remuneration paid to Fickes/Port Royal. Fickes, however, did

37

not provide the promised services to North Carolina Mutual and therefore has no right to retain or otherwise utilize North Carolina Mutual's Trust Assets for his own personal benefit.

204. Accordingly, Fickes has been unjustly enriched in the amount of all administrative fees and other remuneration paid from Trust Assets since April 24, 2015.

205. Equity requires that Fickes compensate North Carolina Mutual for the benefit conferred.

## COUNT IX
## Piercing the Corporate Veil

206. Plaintiff incorporates by reference the allegations contained in the Complaint, as if fully set forth herein.

207. In regard to Port Royal's dealings with North Carolina Mutual, Fickes controlled and completely dominated the policies and business practices of Port Royal so that Port Royal had at the time no separate mind, will, or existence of their own.

208. Fickes' actions were indistinguishable from those of Port Royal.

209. Fickes exclusively controlled and completely dominated Port Royal for the purpose of committing fraud and/or perpetrating dishonest and unjust acts in contravention of Plaintiff's legal rights, including but not limited to, the following:

    A. Defrauding North Carolina Mutual, as alleged above;

    B. Ignoring the corporate form by, inter alia, failing to conduct Board of Directors meetings and appointing idle directors;

    C. Failing to inject capital into Port Royal to meet contractual obligations; and

D. Causing North Carolina Mutual's assets to be transferred to the Trust Account pursuant to the Trust Agreement for the benefit of the Forefront Entities and Individuals, Port Royal, and Fickes.

210. The above referenced control and breaches of duty were the proximate cause of the injury and unjust losses complained of in Counts VII and VIII.

## PRAYER FOR RELIEF

WHEREFORE, North Carolina Mutual Life Insurance Company prays that this Honorable Court:

A. Enter judgment for North Carolina Mutual against the Defendant and an award of actual and punitive damages in an amount to be proven at trial;

B. Enter judgment for North Carolina Mutual on its Fourth Cause of Action for violations of N.C. Gen. Stat. 75-16 against the Defendant, and an award of actual, statutory, and treble damages in an amount to be proven at trial;

C. Award North Carolina Mutual its attorney's fees under N.C. Gen. Stat. § 75-16.1;

D. Award North Carolina Mutual pre- and post-judgment interest on each of its causes of action in which it recovers damages;

E. Award North Carolina Mutual the costs incurred in bringing this action; and,

F. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

North Carolina Mutual demands a trial by jury on all issues so triable.

39

This the 30th day of June, 2022.

WILLIAMS MULLEN

By: /s/ *M. Keith Kapp*
M. Keith Kapp (N.C. Bar #8850)
Wes J. Camden (N.C. Bar # 33190)
Lauren E. Fussell (N.C. Bar #49215)
P.O. Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
Email: kkapp@williamsmullen.com
        wcamden@williamsmullen.com
        lfussell@williamsmullen.com
*Attorneys for Plaintiff*